UNITED STATES of America, Appellee,

v.

Cecil FERGUSON, a/k/a "Mo," a/k/a "Chui," Edward Lawrence Joseph, a/k/a "J.R.," a/k/a "Jamal," a/k/a "Tony," Silvia Baraldini, a/k/a "Louise," and Sekou Odings, a/k/a "Nathaniel Burns," a/k/a "Mugubasi," a/k/a "Eddie Holmes," Defendants-Appellants.

Nos. 458, 459, 569, 570, Dockets 84–1069, 84–1070, 84–1071, 84–1072.

United States Court of Appeals, Second Circuit.

Argued Dec. 13, 1984.

Decided March 28, 1985.

See also 548 F.Supp. 1390.

Lawrence A. Vogelman, New York City (Barry C. Scheck, Cardozo Criminal Law Clinic, New York City, of counsel), for defendant-appellant Edward Lawrence Joseph.

Jesse Berman, New York City, for defendant-appellant Cecil Ferguson.

Chokwe Lumumba, New York City (Lynne F. Stewart, New York City, of counsel), for defendant-appellant Sekou Odinga.

Susan V. Tipograph, New York City (Judith Holmes, New York City, of counsel), for defendant-appellant Silvia Baraldini.

Stacey J. Moritz, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., for the Southern Dist. of N.Y., Barry A. Bohrer, Asst. U.S. Atty., New York City, of counsel), for appellee, United States of America.

Before TIMBERS, CARDAMONE and ROSENN,* Circuit Judges.

CARDAMONE, Circuit Judge:

Sekou Odinga, Silvia Baraldini, Cecil Ferguson and Edward Joseph, who the evidence shows were involved in a series of armored truck robberies and two murders in the Bronx and Nanuet, New York in 1981 and in the prison escape of Black Liberation Army leader Joanne Chesimard, appeal from their convictions for their parts in those crimes. The principal claims of error the defendants raise are: (1) there was no probable cause for the issuance of an intercept order because the applications for electronic surveillance contain material omissions; (2) the trial court had no power to find two defendants guilty as accessories after the fact because they were not indicted as such and accessory after the fact is not a lesser included offense of bank robbery; (3) the maximum legal sentence following a conviction for being an accessory after the fact to armed robbery is 10 years, rather than the 12½ years imposed; (4) it was improper to prosecute defendants, self-professed revolutionaries, under RICO; (5) defendants did not receive a fair trial; (6) the "kidnapping" of two prison guards during the escape of Joanne Chesimard was not a kidnapping under New Jersey law and thus could not serve as a predicate act under RICO; (7) Baraldini's conviction was not supported by sufficient evidence; and (8) Baraldini's sentence was excessive.

Defendants raise many other claims of error.[1] Although sensitive to the various

---

* Honorable Max Rosenn, United States Circuit Judge for the Third Circuit, sitting by designation.

1. The other claims of error are: (1) Ferguson's claim that at sentencing Judge Duffy confused him with defendant Joseph resulting in prejudice to him; (2) that his sentence must be vacated because the government urged the court to take into account evidence of crimes for which he was found not guilty, *see United States v. Sweig,* 454 F.2d 181, 184 (2d Cir.1972); (3) Fer-

and related claims of police misconduct, inordinate prosecutorial zeal and political persecution, we find no merit to any of the arguments raised and hence affirm the convictions.

## I. *Background Facts*

The four named defendants appeal from judgments of conviction entered in the United States District Court for the Southern District of New York after a five-month trial before District Judge Duffy and a jury. The nine count indictment charged eleven defendants. Count one charged eight defendants—including these four—with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. §§ 1961, 1962(d). Count two charged the same eight defendants with a substantive violation of the racketeering statute. 18 U.S.C. §§ 1961, 1962(c). Counts three, four, and five charged Odinga and others with bank robbery, armed bank robbery and murder in the commission of an armed bank robbery based on a 1981 armored car robbery in the Bronx, New York during which a guard was murdered. 18 U.S.C. §§ 2113(a), 2113(d), 2113(e). Counts six, seven, and eight also charged Odinga, Ferguson, Joseph, and others with those same violations based on a 1981 armored car robbery in Nanuet, New York during which a guard and two police officers were murdered. Count nine charged four individuals not involved in this appeal as accessories after the fact to the Nanuet robbery. 18 U.S.C. § 3.

At trial, the government characterized these defendants as members of "The Family." Odinga, according to the government, was a member of a small group that planned the Family's crimes. Ms. Baraldini was a member of the enterprise's so-called "secondary team," a group of women that facilitated the crimes by arranging for cars, safe houses, and reconnaissance. Ferguson and Joseph were alleged to have planned and committed some of the various robberies and attempted robberies. The government produced 129 witnesses, among them were three co-conspirators who were offered protection and a new identity, a woman whose apartment was used as a safehouse, eyewitnesses to the robberies and prison escape, various state and federal law enforcement officers and experts, including agents who testified about wiretaps.

Odinga and Baraldini were found guilty on Counts one (RICO Conspiracy) and two (substantive RICO violation). These were the only counts for which Baraldini was indicted. Odinga was acquitted on Counts three through eight—those involving bank robbery, armed bank robbery, and murder in the commission of the two 1981 armed bank robberies. Ferguson and Joseph were found guilty as accessories after the fact to the bank robbery and armed robbery alleged in Counts six and seven (the 1981 Nanuet, New York armed robbery and murder). But they were acquitted on the charges specified in Counts one and two (the RICO counts) and on Counts six, seven, and eight. Two defendants—not in-

---

guson's and Joseph's contention that the court erred by not giving the formulation of the accessory after the fact charge now preferred by defendants, *see United States v. Tsanas,* 572 F.2d 340, 346 (2d Cir.), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978); (4) Odinga's claim that the district court did not have jurisdiction over him because he was a political prisoner-of-war, *see United States v. Lumumba,* 741 F.2d 12, 15 (2d Cir.1984); (5) that he was not allowed adequate time to prepare his case; (6) that it was an abuse of discretion for the trial judge to exclude as irrelevant evidence of his treatment by police officers or the treatment of other revolutionaries by law enforcement personnel; (7) that it was reversible error to fail

to charge the jury as to his status as a political prisoner-of-war; (8) that his sentence violates the Eighth Amendment prohibition against cruel and unusual punishment; (9) Baraldini's claim that the identification procedures used with Ms. Mitchell were suggestive and that Mitchell's in-court identification had no independent basis apart from the pretrial identification, *see United States v. Shakur,* 570 F.Supp. 333 (S.D.N.Y.1983); and, finally, (10) Odinga's and Baraldini's claims that the imposition of consecutive sentences on the RICO conspiracy count and the RICO substantive count violated the constitutional prohibition against double jeopardy, *see Bagaric,* 706 F.2d at 63.

volved in this appeal—were acquitted on all nine charges.

On February 15, 1984 Judge Duffy sentenced both Ferguson and Joseph to terms of twelve and one-half years. Odinga and Baraldini were sentenced to consecutive terms of 20 years' imprisonment and $25,000 fines on Counts one and two. Thus, these defendants each received terms of 40 years imprisonment and fines of $50,000. We turn to the issues raised by defendants.

## II. Claims of Error Raised by Ferguson and Joseph

### 1. Electronic Surveillance

#### a. Material Omissions from Affidavits in Support of Wiretap Orders

Ferguson and Joseph first contend that the Assistant United States Attorneys (AUSA) deliberately withheld evidence from District Judge Haight, who issued the intercept order, that would have demonstrated that the government's chief informants, Sam Brown and Yvonne Thomas, were unreliable. The government's first application for a wiretap was made on December 15, 1981. The order was issued apparently on the basis that Brown had admitted participation in the Nanuet armed robbery, and FBI agent Maxwell was able to corroborate some of the details given by Brown from his own knowledge. But appellants contend that Maxwell's affidavit based on information from Brown failed to reveal that Brown was known by agent Maxwell to be unreliable.

Appellants argue that the government knew the following facts but omitted them from the application to Judge Haight: Brown was continuously in a neck brace and was often in a great deal of pain (he had been in two car accidents); he had been beaten by state authorities and was afraid of being returned to state custody for fear of additional beatings; he was asking the government to arrange to get him medical treatment; his speech was often disjointed and his answers under questioning were wandering, garbled and unresponsive; he had suffered a "psychotic" episode in his cell December 6, 1981; and he had lied repeatedly in his discussions with the FBI agents, often changing his story in response to their prompting. They contend these same facts were conspicuously absent from the government's requests for extensions of the order and that, in addition, the agents failed to mention Brown's apparent jail suicide attempt when he cut his arms and face on a lightbulb. In the later applications, the defendants assert, the government further relied on information the agents obtained from Yvonne Thomas, who also allegedly showed signs of severe mental problems.

To successfully challenge a search warrant based on the allegations set forth in the underlying affidavit, an objectant must show by a preponderance of the evidence that the affidavit contained false statements that were material on the issue of probable cause. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The statements alleged to be false must be shown to have been made intentionally, knowingly, or with reckless disregard for the truth. *Id.* at 155–156, 98 S.Ct. at 2676–2677. Omissions from an affidavit that are claimed to be material are governed by the same rules. *United States v. Mankani*, 738 F.2d 538, 545–46 (2d Cir. 1984). *See Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85.

With respect to the information obtained from Brown, the affidavits omitted no material facts. The trial judge, in a thorough opinion that disposed of defendants' pre-trial motion, *United States v. Shakur*, 560 F.Supp. 318, 337 (S.D.N.Y.1983), found: the FBI agents saw Brown's medical records, *id.* at 335; Brown's "only manifested signs of illness were disjointed and agitated speech," *id.* at 331; there was no evidence that the agents were engaged in intentional misconduct, *id.* at 332 n. 16; the FBI did not coerce Brown—either through mistreatment or through threatening to withhold requested medical care, *id.* at 333; Brown's attorneys never attempted to obtain psychiatric help for him, *id.* at 336; the incident in which Brown cut himself on

a lightbulb was not a suicide attempt and was not evidence of a serious mental illness, *id.* at 336; and the effects of the alleged beatings by state officials were too attenuated at the time he was questioned by federal officials to have affected Brown's reliability, *id.* at 333. A district court's findings of fact after a *Franks* hearing are subject to the clearly erroneous rule, and we find no reason to disturb Judge Duffy's findings on these matters. *See* Fed.R.Civ.P. 52(a).

 Further, Brown's admission of participation in the Nanuet robbery, which included details not publicly known, and Maxwell's corroboration of that admission, adequately demonstrate his reliability. Appellants argue that while an admission of participation may obviate any need to show past reliability, it does not cure the need to reveal material facts other than participation. We disagree. An affidavit in support of a search warrant application that contains both lawful and tainted allegations is valid if the lawful information, considered independently, supports probable cause. The ultimate inquiry on a motion to suppress is not—as defendants contend—whether the affidavit contains false allegations or material omissions, but whether after putting such aside, there remains a residue of independent and lawful information sufficient to support probable cause. *United States v. Lace,* 669 F.2d 46, 48–49 (2d Cir.), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982). This is also true of the information supplied by Thomas. The government's failure to indicate that Thomas' information was provided during an interview in a mental hospital is not fatal to the warrant. As the district court correctly noted, even without the information provided by Thomas there was sufficient information to establish probable cause. *United States v. Shakur,* 560 F.Supp. at 336.

### b. *Curtailment of Pretrial and Posttrial Hearings*

Appellants also urge that the trial court improperly curtailed the pretrial and post-trial hearings. Ferguson and Joseph first assert that they were not allowed to call prison guards and various law enforcement personnel as witnesses to show that the government actually knew the full extent of Brown's mental and physical illness. They next claim that they were prevented from calling the AUSA as witnesses to ascertain what they knew about Brown's condition. Appellants finally contend that Brown himself was effectively prevented from testifying. When Brown was called at the post-trial hearing, Judge Duffy ruled that if Brown testified about his treatment by government agents—after claiming the protection of the Fifth Amendment—he would also have to testify about the Brink's robbery.

 First, appellants' speculation about what a prison guard might know did not entitle them to a hearing on the issue of Brown's reliability because such "allegations must be accompanied by an offer of proof." *Frank,* 438 U.S. at 171–72, 98 S.Ct. at 2684–85. "[A]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* Appellants made no offer of proof and Brown's medical records did not support their claim that he was incapable of being reliable. Nor was an offer of proof made respecting the defendant's inability to call any AUSA. Finally, the trial court's refusal to permit Brown to limit his testimony to the events following October 20 during the post-trial hearing was in accord with established law. A witness who testifies does not have the "'right to set forth ... all the facts which tend in ... favor [of one party] without laying himself open to a cross-examination upon those facts,'" *Brown v. United States,* 356 U.S. 148, 155, 78 S.Ct. 622, 626, 2 L.Ed.2d 586 (1958), and the testifying witness may be cross-examined as to all non-collateral matters. *See United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963).

### 2. Indictment for Accessory After the Fact

Ferguson and Joseph next contend that the district court erred in instructing the jury that the defendants could be held liable as accessories after the fact to the crimes of robbery and armed robbery. They assert that they were not indicted and did not waive indictment as accessories, and that being an accessory after the fact is not a lesser included offense to robbery or armed robbery. To resolve this troublesome issue, we must examine an accused's right to an indictment when charged with a crime, how that right may be waived, and whether concluding that such waiver occurred defeats the fair administration of justice.

### a. The Right to an Indictment

The Fifth Amendment states that: "[n]o person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury...." In an early case the Supreme Court made clear that an indictment was an indispensable jurisdictional ingredient of the court's power to try a defendant. *See Ex Parte Bain,* 121 U.S. 1, 6, 7 S.Ct. 781, 784, 30 L.Ed. 849 (1887). Rule 7(a) of the Fed.R.Crim.P. specifically provides that "[a]n offense which may be punished by imprisonment for a term exceeding one year ... shall be presented by indictment." The requirement of prosecution by indictment is included as a personal right in the Fifth Amendment to protect a presumably innocent defendant. During the seventeenth century the English Crown Prosecutor had enormous power in a criminal case, while the person charged had few rights. For example, a defendant had no right to testify on his own behalf, to call witnesses or have counsel. *See* Radcliffe & Gross, *The English Legal System,* 341 (5th ed. 1971). As a result, the Founders insisted that the bulwark of a grand jury be interposed between the government as accuser and the citizen as the accused to serve as a necessary shield for the innocent. *See United States v. Calandra,* 414 U.S. 338,

342–43, 94 S.Ct. 613, 617–18, 38 L.Ed.2d 561 (1974); *United States v. Hogan,* 712 F.2d 757, 759 (2d Cir.1983). An indictment protects the Sixth Amendment right that an accused "be informed of the nature and cause of the accusation." *See Russell v. United States,* 369 U.S. 749, 761, 82 S.Ct. 1038, 1045, 8 L.Ed.2d 240 (1962). When a legally constituted grand jury—the neutral buffer between the government and the accused—is absent, the accused's Fifth and Sixth Amendment rights may easily be eviscerated. For example, we held that an indictment handed down after the life of the grand jury had expired is a nullity, despite the entry of a plea of guilty. *See United States v. Macklin,* 523 F.2d 193 (2d Cir.1975). Thus, we are committed to the preservation of these constitutional guaranties. Yet, where these rights are not threatened, the rules governing indictments should be administered in a manner that will not defeat the fair administration of justice.

### b. Waiver of Indictment

Just as a defendant may waive a trial by jury, which is designed for the protection of the personal rights of the accused, a defendant may waive the similar personal right of indictment by a grand jury. *See United States v. Gill,* 55 F.2d 399, 401 (D.C.N.Mex.1931). In fact, as the grand jury need find only probable cause to believe the accused committed the crime, rather than guilt beyond a reasonable doubt, a waiver of grand jury indictment is of somewhat less consequence than waiving the right to trial by jury. *United States v. Montgomery,* 628 F.2d 414, 416 (5th Cir.1980). Rule 7(b) of the Fed.R. Crim.P. provides for waiver of indictment: "An offense which may be punished by imprisonment for a term exceeding one year ... may be prosecuted by information if the defendant, after he has been advised of the nature of the charge and of his rights, waives in open court prosecution by indictment." Waiver of indictment is an act clothed in formality. Although no particular catechism is prescribed, the waiver must be made in open court, defendants

must be informed of the nature of and the cause for the accusation, and the court must be satisfied that the defendants waive their rights knowingly, intelligently and voluntarily. *See United States v. Macklin,* 523 F.2d at 196; *Beardslee v. United States,* 541 F.2d 705, 706 (8th Cir.1976) (per curiam).

### c. *The Defendants' Waiver*

We now consider whether there was a valid waiver of an indictment charging Joseph and Ferguson as accessories after the fact for the offenses set forth in counts six and seven of the existing indictment. Defendants Ferguson and Joseph take a position on appeal contrary to their vigorous request to the trial court for instructions to the jury. Now they assert that they were never indicted for accessory after the fact and that it is not a lesser included offense of bank robbery. Therefore, they argue, that unless advised on the record of their rights to indictment, counsel's request for an accessory after the fact charge, "even if it were a well-advised trial tactic," and we believe that it was, "could not and did not rise to the required level of an informed waiver." We disagree.

We are not concerned with the jurisdiction of the court to try these defendants, as we were, for example, in *United States v. Macklin, supra,* where the term of the grand jury had expired and the indictment returned by it was legally null and void. Absent an indictment, it is understandable that a waiver be clothed in some formal procedure, including information to the defendant concerning the nature of the charge and his rights. By contrast, the defendants in this case are in court on a valid indictment charging them specifically with bank robbery (count VI) and armed

bank robbery (count VII) in Nanuet, New York, in 1981, in the course of which a guard and two police officers were slain.

The defendants represented in court by counsel were parties to a specific request to the court for an instruction to the jury on a charge of accessory after the fact to the Nanuet robbery. In requesting the instruction, the defense specifically stated to the court: "There has been evidence presented, including wiretapped telephone conversations, bugged conversations at 85 Barrow Street, and physical and photographic surveillance, from which you may or may not draw the inference that in February and March 1982, [Ferguson and Joseph] brought food and messages to Mutulu Shakur (a co-defendant) at 85 Barrow Street at a time when Mutulu Shakur was hiding at that address." Counsel for the defendants also conceded at the time of the request that there was evidence that the defendants concealed Shakur with knowledge of Shakur's participation in the October 20th Rockland bank robbery.[2]

■■■ Thus, the defendants were well aware of the specific evidence upon which they urged a charge of accessory after the fact and they knew the nature of the offense as set forth in their requested instruction to the court. They specifically requested the instruction and successfully convinced the court to give it, even in the face of the informed opposition of the government. They also had to know that they were not named in count nine of the indictment, the accessory after the fact count. This deliberate and studied course of conduct displayed a lively cognition of their rights. The trial judge responded to the request, gave the instruction, and the defense strategy obviously succeeded. The

---

**2.** In the requested instructions, the defendants also asked the court to instruct the jury: "Thus, if you are not persuaded beyond a reasonable doubt that [Ferguson and Joseph] were in Rockland County on October 20, 1981, you must consider whether [their] activities after that date in connection with Mutulu Shakur constituted the offense of accessory after the fact, as I have defined it." In a note attached to the requested instruction, the following statement appears.

"The offense of being accessory after the fact can be charged separately or in conjunction with the principal offense. *It could also apparently be a subject of a lesser included offense instruction, from the holding in United States v. Jackson, 448 F.2d 963 (9th Cir.1971), cert. denied, 405 U.S. 924 [92 S.Ct. 970, 30 L.Ed.2d 796] (1972)."* Citing Devitt & Blackmar 21.02, at 616, notes (emphasis added).

jury acquitted these defendants of the substantive charges and found them guilty of having committed the lesser offense.

Under these circumstances, the execution of a written waiver and a statement by the trial judge in open court of defendants' rights, as indicated in Fed.R.Crim.P. 7, at this stage of the trial would have been a mere formalism. It would not have added anything defendants did not already know. And, for similar reasons, the filing of an information by the United States Attorney as required by Fed.R.Crim.P. 7(b) was dispensable under the circumstances. Having obtained from the court precisely what they affirmatively sought, it ill behooves defendants now to complain that their waiver of indictment to the offense lacked the formality stated in Fed.R.Crim.P. 7. The requirements of Rule 7 serve a salutary purpose and, of course, should ordinarily be observed. We also recognize that courts do not look with favor on a waiver of constitutional rights and do not "presume acquiescence in the loss of fundamental rights." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). But that policy of disfavor should not blind a court from seeing a defendant's true aims. Here, there was no mere acquiescence or uncertainty in the defendants' actions. We have before us an intelligent, deliberate course of conduct calculated to prevail upon the court to instruct the jury on a lesser offense. The defense successfully articulated its position in the face of the government's opposition that the lesser offense was not a component element of the substantive robbery charges. Under the extraordinary circumstances of this case, the failure to observe the formalities of Fed.R.Civ.P. 7 will not serve to invalidate the convictions of accessory after the fact, particularly in light of our conclusion that the criteria for waiver of indictment have been effectively satisfied and that none of defendants' rights safeguarded by indictment under Rule 7(a) and implicated in the Fifth and Sixth Amendments have been significantly diminished.

### 3. *Maximum Legal Sentence for Accessory After the Fact*

■ Ferguson and Joseph finally contend that the maximum legal sentence following a conviction for being an accessory after the fact is 10 years, rather than the 12½ years imposed. 18 U.S.C. § 3 reads:

> Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by death, the accessory shall be imprisoned not more than ten years.

This language plainly provides that an accessory can be given one-half the term imposed on the principal. One half of the sentence for armed bank robbery is 12½ years. But the statute also states that if the principal is punishable by death, an accessory shall be imprisoned for not more than ten years. Thus, when the principal is subject to the maximum death sentence, his accessory faces no more than 10 years imprisonment, but an accessory to an armed bank robber may be sentenced to 12½ years.

When the aim of Congress is unclear because of inconsistent penalty provisions, courts construing the statute apply the rule of lenity. *See Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). If we were to find this language ambiguous, and were without legislative history to clarify the ambiguity, the 12½ year sentence would have to be reduced to 10 years. "This policy of lenity means that the court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Ladner v. United States*, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958). Here, although the legislative scheme is admittedly anomalous, it is not ambiguous or internally inconsistent. Had Congress intended to restrict

punishment for accessories to 10 years it could have done so. Hence, the rule of lenity does not apply and defendants' sentences were properly imposed. *See Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983). (Court assumed that when Congress defined "interest" differently in 18 U.S.C. § 1963(a)(1) and (a)(2) this difference was intentional and "would not presume to ascribe this difference to a simple mistake in draftmanship").

### III. Claims of Error Raised by Baraldini and Odinga

#### 4. Use of RICO

Baraldini, joined by Odinga, argues that the trial court erred in allowing the government to prosecute these defendants as criminal racketeers.

#### a. Economic purpose

 There is no merit to the claim that there was insufficient economic purpose for RICO to be applied to these self-professed revolutionaries. There must merely be *"some* financial purpose," *United States v. Bagaric,* 706 F.2d 42, 55 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983) (emphasis supplied), *either* to the criminal enterprise or the acts of racketeering. Appellant's reliance on *United States v. Ivic,* 700 F.2d 51 (2d Cir.1983), is misplaced. It does not stand for the proposition that there must be a *significant* economic purpose for RICO to apply. In *Ivic,* we expressly stated that we were not addressing a situation in which a terrorist organization engaged in robberies to obtain money to further their activities. 700 F.2d at 61 n. 6. Here, the defendants' activities centered around the commission of economic crimes. These defendants were charged with ten robberies and attempted robberies of armored trucks, the murders of guards and police officers at the scene of those crimes, and the use of the money obtained from those robberies to support enterprise members and to maintain safe houses.

#### b. "Enterprise" Proven by Facts Independent of Predicate Acts

 Nor is there any merit to Baraldini's claim that the "enterprise" was not proven independent of the predicate acts. RICO charges may be proven even when the enterprise and predicate acts are "functionally equivalent, and 'the proof used to establish [them] ... coalesce[d]' ". *Bagaric,* 706 F.2d at 57, *quoting United States v. Turkette,* 452 U.S. 576 at 583, 101 S.Ct. 2524 at 2528, 69 L.Ed.2d 246; *United States v. Mazzei,* 700 F.2d 85, 89 (2d Cir. 1982). Moreover, the jury was presented with proof entirely separate from the existence of the two predicate acts. The government presented evidence of the Family's structure, the Action Five of which Odinga was a member, the secondary team which included Baraldini, the network of safehouses, continuing strategy and planning sessions, and the links among numerous criminal acts.

#### 5. Fair Trial

 We also find no merit to Baraldini's claim, joined in by the others, that she was denied a fair trial. First, the claim that the district judge was biased, based in part on the hostility expressed between one of the defense counsel and the district judge, is belied by the fact that the defendant represented by that lawyer was acquitted. It is difficult to see, therefore, how this could have prejudiced Baraldini. Moreover, it was not an abuse of discretion, and did not evidence a predisposition, for the trial judge to determine that unrelated investigations and the mistreatment of Odinga by state officials were irrelevant. In fact, the record reflects numerous examples of Judge Duffy's willingness to accommodate defendants' religious beliefs and their personal needs.

Second, Baraldini complains that Judge Duffy's refusal to name Susan Tipograph as appointed counsel was an abuse of discretion and denied her a fair trial. We disagree. As the trial court noted, Ms. Tipograph was not an attorney eligible for such appointment and had undertaken to

represent Baraldini without any promise of payment. Further, her counsel's repeated reference to the trial transcript demonstrated her access to the transcript.

■ Third, appellant challenges the use of an anonymous jury. We have fully considered and resolved the issue of the effect that jury anonymity has on a defendant's presumption of innocence. *United States v. Thomas,* 757 F.2d 1359 (2d Cir.1985). Here, as in *Thomas* and *United States v. Barnes,* 604 F.2d 121 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), there was justification for keeping jurors' identities secret: evidence at trial was to "include descriptions in which the defendants discuss killing two government witnesses"; a "wanted-dead or alive poster of another government witness had been circulated"; in the related state court proceedings, defense counsel had referred to witnesses as "war criminals"; and one fugitive defendant had written an "exhortation" calling for "a campaign that targeted individual U.S. Attorneys or grand jurors [involved in this case] and [held] them accountable for the impact of their actions." *United States v. Shakur,* SSS 82 Cr. 0312, slip op. at 8 (S.D.N.Y. March 29, 1983). And, as in *Thomas* the district judge attributed the jury's anonymity to a need to protect their privacy from the press. *Id.* at 1365 & n. 1; *see also Barnes,* 604 F.2d at 141. Baraldini's complaint that prospective jurors should have been questioned on *voir dire* about possible fear of jury service cuts both ways—such interrogation could well have created or heightened such fear.

■ Finally, no prejudice arose from other security measures taken under the circumstances. As many as two dozen plainclothed marshals were sometimes present at trial, they drove the jurors home at night, and there was a metal-detecting device present at the entrance to the courtroom. We agree that courts must guard against an "ostensible display of unusual precaution which might have been interpreted as singling out th[ese] defendant[s] as ... particularly dangerous or guilty per-

sons." *Hardee v. Kuhlman,* 581 F.2d 330, 332 (2d Cir.1978). But in view of the charges against the defendants, the threats that were made against witnesses and prosecutors, the disturbances occurring during the trial which added to the tense atmosphere, the fact that two important witnesses were in the witness protection program, and the number of defendants on trial, we find that the security measures employed were not prejudicial. Moreover, the effect on the jurors of the unusual precautions taken here were somewhat ameliorated because the marshals were not uniformed, the metal-detector was out of the juror's view, and the night escort service was a lesser measure than permissible sequestration.

### 6. Kidnapping as a Predicate Violation Under RICO

The jury found that one of the predicate acts for Baraldini's RICO conviction was her participation in the kidnapping of two prison guards during the prison escape of Joanne Chesimard. The guards were handcuffed, placed in a van and driven 200 yards down the road from the prison. Baraldini, again joined by Odinga, argues that Ms. Chesimard and her allies commandeered the prison van and put the guards inside as a necessary and incidental feature of the escape and that, under New Jersey law, the events cannot constitute a kidnapping. Appellants rely on *State v. Hampton,* 61 N.J. 250, 294 A.2d 23 (1972), in which the court considered whether the "asportation and detention were ... incidental to the underlying crime, and ... substantially increased the risk of harm to the victim beyond that normally inherent in breaking and entering." 61 N.J. at 276; 294 A.2d at 37. Baraldini argues that under these facts her RICO conviction cannot stand on such a *de minimus* "kidnapping." In the alternative, she asks that a new trial be ordered with the asportation issue submitted to the jury.

■ Under New Jersey law "[a] person is guilty of kidnapping if [s]he [by force or threat] *removes another from his place of* residence or *business, or* a substantial distance from the vicinity where he

is found ... in order [t]o facilitate commission of any crime or flight thereafter." N.J.Stat.Ann. § 2C:13–1(b)(1) (emphasis added). By its own terms, the statute does not require proof that the victim be removed "a substantial distance" when, as here, the victim is removed from his place of business. *See State v. Masino*, 94 N.J. 436, 442, 466 A.2d 955, 961 (1983). Since this claim of error fails in light of the clear language of the New Jersey statute, it is unnecessary to reach the government's contention that the kidnapping was not, in any event, incidental to the escape, or its argument that the *Hampton* rule does not apply to hostage situations. *See State v. Wooten*, 135 N.J.Super. 6, 342 A.2d 549 (1975), *aff'd by an equally divided court*, 73 N.J. 317, 374 A.2d 1204 (1977).

#### 7. *Sufficiency of Evidence*

■ Baraldini's challenge to the sufficiency of evidence supporting the two predicate acts, although presenting a close question, also fails. The jury found Baraldini guilty of two of the five predicate acts alleged in the indictment: the New Jersey kidnapping and an attempted armed robbery in Danbury, Connecticut on December 22, 1980. Claims of lack of sufficiency of the evidence to establish guilt are not often successful because a jury verdict must be upheld where, taking "the view most favorable to the government," there is substantial evidence to support it. *See Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). As the jury resolves all issues of credibility and determines the facts, an appellate court must draw all available inferences in favor of the jury's verdict. When evaluating the sufficiency of the evidence, a RICO conviction is no different from others, and hence the same rules apply. *See United States v. Bagaric*, 706 F.2d at 64. Here, the evidence sufficiently demonstrated Baraldini's guilt on both counts.

#### a. *Danbury Attempted Robbery*

■ Rison, a confederate who participated in the Danbury attempted robbery, testified against Baraldini. Rison testified that Baraldini had participated in the attempt. He based his conclusion on the fact that he saw more switch cars than drivers at the scene of the attempt and that Baraldini was a member of the secondary team of drivers. But he acknowledged that he did not actually see Baraldini at the scene. Rison also testified that Baraldini had committed another robbery based on a similar presumption, when, in fact, she was in Zimbabwe at the time. Thus, standing alone, Rison's testimony is clearly legally insufficient evidence. But another witness, Sondra Mitchell, provided sufficient evidence to sustain Baraldini's conviction when she testified that on December 22, 1980 while at home dressing for her grandmother's funeral, she allowed members of "The Family" to prepare for the Danbury robbery. She identified Baraldini as one of the women donning wigs on the day of the attempt.

#### b. *Kidnapping*

■ Rison also testified against Baraldini with respect to the kidnapping, stating that he saw her on the morning of the escape waiting with a switch car outside a safe house in East Orange, New Jersey. He saw her immediately after the escape at the safe house and testified that at the same time he saw others whom he said had been at the escape scene. But, again, he admitted that he had not actually seen Baraldini at the scene of the escape and that he had not seen her at any planning meeting. Nonetheless, while the proof against her is admittedly weak, it must be considered together with a handwritten evaluation of the "operation," which was seized during a search of Odinga's Pittsburgh safe house. In that document a Family member expressed concern that the police would trace a van that Baraldini had purchased shortly before the escape and later turned over to Odinga. The written report recommended that the van be removed from insurance coverage and sold. Both steps were promptly taken. This, when combined with Rison's testimony, provides

sufficient evidence to sustain the predicate kidnapping offense against Baraldini.

### 8. *Baraldini's Sentence*

Baraldini finally contends that her sentence, two consecutive 20 year terms, was excessive. Whatever views we may entertain concerning the severity of the sentence it was within statutory limits, *see United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972), and consistent with penalties given in this and other jurisdictions for the same offenses. *See, e.g., Bagaric*, 706 F.2d at 52 (consecutive sentences on RICO conspiracy and substantive counts, totaling 40 years). Baraldini contends that she did not have a significant prior criminal record and that, in any event, her role in the crimes for which she stands convicted was minor. She also claims that Judge Duffy failed to question her about possible inaccuracies in the pre-sentence report, that the sentence was based on her political beliefs, and that it was unfair to tack together the two 20 year sentences.

The seriousness of the crimes in which Baraldini was involved is self-evident regardless of her prior record, and as the driver of a getaway car her role in the crimes was significant. Moreover, she had ample opportunity to address the court regarding inaccuracies in her pre-sentence report and failed to do so, and she cites no evidence to support her claim that she was sentenced because of her political beliefs.

### IV. *Conclusion*

We have considered the other claims of error raised by appellants and we find all of them to be without merit. Summarized, our principal holdings are:

(A) With respect to the claims of appellants Ferguson and Joseph:

(1) There were no material omissions in the applications for electronic surveillance concerning Brown, and probable cause existed even if Thomas's information was excluded.

(2) The court had power to find the two guilty as accessories after the fact because the appellants' request to charge was "in-

vited error" and sufficient under the circumstances to constitute a knowing waiver under Fed.R.Crim.P. 7(b).

(3) The maximum legal sentence under 18 U.S.C. § 3 following a conviction for accessory after the fact to armed robbery is 12½ years. Although the section is anomalous, it is unambiguous and reflects Congressional purpose and must be sustained.

(B) With respect to the claims of appellant Baraldini and Odinga:

(4) It was not impermissible to charge these defendants under RICO because their activities involved an economic purpose and there was proof of both an enterprise and a pattern of racketeering.

(5) Appellants received a fair trial.

(6) The kidnapping of the prison guards during the Joanne Chesimard escape was a kidnapping under New Jersey law because the guards were removed from their place of business.

(7) There was sufficient evidence to support Baraldini's conviction.

(8) Baraldini's sentence was not excessive.

Accordingly, all of the judgments of conviction are affirmed.